*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CODY ROSS and MOLLY ROSS,

        Plaintiffs-Appellants,

v

ALEXANDRA J. DEEHAN,

        Defendant-Appellee.

UNPUBLISHED
January 22, 2025
1:23 PM

No. 367262
Sanilac Circuit Court
LC No. 22-039461-CZ

Before: LETICA, P.J., and GARRETT and FEENEY, JJ.

FEENEY, J. (*dissenting*).

The trial court granted defendant's motion for involuntary dismissal of plaintiffs'[1] request for specific performance of a land sale contract. For the reasons discussed below, I conclude that the trial court erred when it granted the motion and respectfully dissent.

## I. FACTS

In 1962, Robert Deehan purchased property located at 3741 Shabbona Road in Snover, Michigan (the "Property"). He never recorded his interest in the Property, but it is uncontested that he had title. Deehan lived at the Property until 2018 when he had a stroke and was brought to a permanent treatment facility. After his stroke, he was deemed legally incompetent, and Kelly Strozeski, a public guardian, was appointed as his legal guardian ("guardian") in June 2018. She served this role until Deehan died in April 2020.

In 2013, Deehan executed a Last Will and Testament which devised all of his property to his daughter, defendant-appellee Alexandra Deehan ("defendant"), after debts, taxes, and burial

---

[1] While only Cody Ross's name was on the purchase agreement, the lower court caption included both Cody and Molly Ross as plaintiffs, and our caption reflects the caption from the appealed order. Defendant never questioned Molly Ross' inclusion as plaintiff in this matter.

costs were paid and $100 was left to each of her siblings. The same day, he also issued defendant a "Lady Bird" deed.[2]

Plaintiffs-appellants Cody and Molly Ross ("plaintiffs") own property adjacent to the Property. After Deehan's stroke, they were put in contact with the guardian, and eventually became interested in purchasing the Property. It is unclear from the record who first brought up the possibility of a sale, but there was mutual interest in selling the Property.[3] After inspecting the Property and determining what renovations were necessary, plaintiffs offered a purchase price of $28,000.[4] On December 17, 2019, plaintiffs drafted a purchase agreement that was contingent on the probate court's approval and gave it to the guardian. On January 7, 2020, the guardian filed a petition in the probate court requesting permission to sell the Property. The petition included the purchase agreement as an attachment. The guardian served Robert Deehan, defendant, defendant's brother, defendant's friend, and plaintiff Cody Ross copies of the Notice of Hearing and Petition Regarding Real Estate/Dwelling via first class mail on January 7, 2020. The probate court had a hearing and approved the petition on February 10, 2020, pursuant to the terms of the purchase agreement. During the course of finalizing the sale, the process was delayed because it was discovered that Deehan had never properly filed his deed and he was not in the chain of title. During this delay, Deehan died on April 20, 2020. Plaintiffs waived the title defects and tried to continue with the purchase.

On May 18, 2020, defendant recorded her Lady Bird deed and claimed the Property as her own. Plaintiffs inquired about continuing the sale, but defendant did not want to sell the Property. Plaintiffs were still interested in purchasing the Property, and after learning about unpaid back taxes on the Property, paid two years' worth of back taxes in December 2021 to avoid it going into foreclosure and preserve the opportunity to purchase the Property pursuant to the purchase agreement.

On January 21, 2022, plaintiffs brought suit in Sanilac Circuit Court seeking specific performance of a contract for the sale of the Property, or in the alternative, claiming unjust enrichment for the unpaid taxes. In her response to the complaint, defendant raised several defenses including a lack of consideration, title issues, and unjust enrichment against plaintiffs; she also stated that she did not want to sell the Property. In July 2023, the circuit court conducted a bench trial where plaintiffs put on two witnesses: the guardian and plaintiff Cody Ross. At trial, the guardian testified that it was standard practice for guardians to pursue the sale of property to

---

[2] A Lady Bird deed, or an "enhanced life estate," is a deed which reserves to the grantor the rights to sell, commit waste, and almost everything else. It conveys the rest which the grantor has not disposed of to the grantee in the event of the grantor's death. See Black's Law Dictionary (10th ed), p. 503.

[3] The guardian testified that she did not seek out plaintiffs to purchase the property, and plaintiff Cody Ross testified that he and his wife needed to bring electricity to his adjacent property through the Deehan property when he learned that it might be for sale, so he contacted the guardian who informed him that they were looking to sell the property; after that, he submitted a purchase agreement to the guardian.

[4] In 2019, Argyle Township found that the Property had a taxable value of $44,600.

prevent spoliation and then to present the probate court with an offer. Once the probate court approved the sale, a guardian would work toward closing the sale as though there were a contract between the parties. The guardian also testified that the probate court approved the sale of the Property on February 10, 2020, pursuant to the terms in the purchase agreement. After the witnesses' testimony, the defense moved for a directed verdict. The court stated that it would withhold judgement on the motion until after the conclusion of proofs, at which point the defense stated it would present no proofs. The court ruled from the bench and found that the contract did not satisfy the statute of frauds because the probate court order only gave the guardian permission to begin selling, and thus did not authorize a previous agreement; therefore, it was not enforceable against defendant. The court therefore ruled against plaintiffs' claim for specific performance. The court also found that defendant had title to the Property,[5] and plaintiffs were entitled to be repaid the amount they paid in back taxes. Finally, the trial court granted a motion for involuntary dismissal rather than directed verdict. This decision was issued in writing July 25, 2023, and from this decision, plaintiffs appeals.

## II. ANALYSIS

The pivotal issue in this case is whether there was a contract between plaintiffs and the guardian for the sale of the Property. To analyze whether there was a contract, there are two important threshold issues: whether the guardian was authorized to enter into a contract to sell the Property, and whether a contract was formed that can satisfy the statute of frauds. If either of these issues are found in the negative, then there could be no valid contract and the guardian's power to continue the sale proceedings terminated with Deehan's death, so defendant would have the power to terminate the sale. If both threshold issues are found in the affirmative, however, then the guardian formed a contract to sell the Property which is enforceable even after the death of one of the parties.[6]

The powers of the guardian are enumerated in MCL 700.5422(3). Determining the scope of those powers is a question of statutory interpretation, which this Court reviews de novo. See *Christie v Wayne State Univ*, 511 Mich 39, 47; 993 NW2d 203 (2023). Further, "[t]he trial court's ultimate decision on a motion for involuntary dismissal under MCR 2.504(B)(2) is reviewed de novo, and the underlying findings of fact are reviewed for clear error." *Samuel D Begola Servs v Wild Bros*, 210 Mich App 636, 639; 534 NW2d 217 (1995). "[A] suit for specific performance being an equitable action, we review the ultimate determination de novo." *Id.* The facts in this case are not disputed, so this Court reviews the trial court's legal conclusions de novo regarding

---

[5] The circuit court found this by only looking at whether a contract was formed instead of relying on the Lady Bird deed. Ultimately in this case, the existence of the Lady Bird deed is irrelevant: if there was a valid contract, Deehan would have retained the power to sell and could not have devised more to his daughter than he had via the Lady Bird deed. If there was no valid contract, then the plaintiffs have no claim to the Property. Therefore, the Lady Bird deed plays little part in this proceeding.

[6] See *Emmet Cty Treasurer v Litzner*, unpublished per curiam opinion of the Court of Appeals, issued Jan 12, 2023 (Docket No. 359447), p 8 (stating heirs or devisees are considered proper parties to litigation involving the deceased's real estate). See also *Van Horn v Herndon*, 253 Mich 408; 235 NW 231 (1931); MCL 700.3803(2).

contract formation and the proper remedy for contract breach. See *Perry v Sied*, 461 Mich 680, 681 n 1; 611 NW3d 516 (2000).

## A. GUARDIAN'S AUTHORIZATION TO CONTRACT

Under EPIC, the role of a guardian or conservator is to act in the best interest of the protected party to ensure the proper care and management of their affairs until such a point that the individual can take care of themselves. See MCL 700.5106; see also MCL 700.5314. With court approval, a guardian may be able to act as a conservator and sell the protected individual's property. See MCL 700.5423.[7] For the present case, it is important to understand whether Deehan's guardian was authorized to begin the process for selling the Property when she filed the petition for sale with the probate court.

The trial court determined the guardian was not so authorized. It relied on the language of MCL 700.5422(3), which states:

> A conservator shall record an order allowing the sale, disposal, mortgage, or pledge of or placement of a lien on real property under section 5423 in the records of the register of deeds for the county in which the real estate is located. Unless the order [for sale of real estate] has been recorded or a person to whom an interest in the real estate is transferred has been given a copy of the order, the person is not entitled to presume that the conservator has the power to sell or otherwise dispose of the real property.

In its reading of the statute, the trial court found that a prospective purchaser of real property from a conservator could not presume the conservator could sell the property, so the purchaser had no ability to even propose an offer before the probate court gave permission to sell.[8] In the trial court's view, a conservator must first determine that some property ought to be sold, then they must get permission from the probate court to start the selling process; subsequently, they must get an offer that the probate court must approve. Therefore, when plaintiffs gave an offer to the guardian, the guardian had no power to consider it until after the court had given its approval for her to consider selling the Property, so her signature was not binding until after she had received court approval.

---

[7] While EPIC is not clear on guardians acting as conservators in non-minor guardian cases (Cf. MCL 700.5215(a) dealing with minor guardians), on February 10, 2020, the probate court in this case signed the Amended Order Regarding Real Estate/Dwelling, PC 647, that directly references MCL 700.5423 entitled "Powers of conservator in administration." It granted the "Office of St. Clair County Public Guardian" authority to sell Deehan's property to plaintiffs for $28,000.

[8] The trial court used the titles of "conservator" and "guardian" fairly interchangeably. In this case, the guardian was acting as a conservator when she was attempting to sell the Property. There is nothing in the record to indicate that the guardian was appointed as a special conservator pursuant to EPIC, but neither party is contesting her acting as a conservator; they are only contesting whether those actions are binding. Accordingly, references to "conservator" in statutory language apply to the guardian in this case.

This reading of the statute complicates the probate court process, and requires superfluous work for the probate court. Indeed, this would at least double the number of hearings that the probate court would have to hold for conservator sales of property. Each sale would require a pre-sale hearing allowing sales proceedings to be initiated, then each offer would have to be individually heard. This is unnecessary. A plain reading of the statute would suggest that there can be no presumption that a conservator can sell any property, but they could entertain offers that are contingent on the probate court's approval.[9] Once the court has given its approval, the sale can commence, and the previous dealings would be enforceable by either involved party, which makes sense because most instances of the guardian disposing of the protected individual's property are subject to court approval. See e.g., MCL 700.5314(b), MCL 700.5423(3). The potential buyer has no recourse if the court rejects an offer, so they have no *presumption* there will be a sale until the court has approved the offer. That is not to say that the conservator cannot start the process of selling, only that they cannot actually sell without court approval.[10]

The statutory language supports this reading of the text. MCL 700.5423(2)(g) states that a conservator has the power to "acquire or dispose of estate property . . . for cash or credit, at public or private sale, or manage, develop, improve, exchange, partition, change the character of, or abandon estate property" according to MCL 700.5423(3). MCL 700.5423(3) reads, "[a] conservator shall not sell or otherwise dispose of the protected individual's principal dwelling [or] real property…without approval of the court. The court shall only *approve the sale* . . . [if it] otherwise determines [it] is in the protected individual's best interest." (Emphasis added). The court approves *sales* of property; in order for the court to approve a sale, there must be a proposed sale to approve. This is further seen from the plain language of the order approving the sale of the Property: "[The guardian] is authorized to sell to [plaintiffs] the property described above for $28,000 [according to] the petition . . . ." Approval is given for the *sale*, not for the selling process. This must mean that a conservator has the authorization to pursue a sale, subject to the court's approval, and when they receive an offer they are happy with, they can bring it to the court for approval. Additionally, under MCL 700.5423(2)(l), a conservator can grant an option regarding the disposition or sale of property without court approval. If a conservator may grant a binding option guaranteeing the ability to sell without court approval, logically, they can field nonbinding offers without court approval as well.[11] Therefore, a guardian or a conservator does not need to

---

[9] In fact, in her trial testimony, the guardian said that this is standard practice in her field. Once an offer is received, it is brought to the probate court for approval; once approved, the guardian then acts according to that offer, until it is closed. Adding an extra step into the process before an offer is even given seems to be giving more work to the probate court for no reason.

[10] Other states with similar guardianship statutes affirm that guardians may sell their ward's real property with court approval. See e.g. *CitiFinancial Inc v Balch*, 195 Vt 21, 26-27; 86 A3d 415 (2013); *In re Guardianship of FEH*, 154 Wis2d 576, 583-584; 453 NW2d 882 (1990); *Webster & Moorefield, PA v City Nat'l Bank*, 453 So2d 441, 444 (1984); See also *H.D.W., Power of Guardian to Sell Ward's Property without Order of Court*, 108 ALR 936, 944 (1937).

[11] See *Lucas v Roslund Prestage & Co (In re Greer)*, unpublished per curiam opinion of the Court of Appeals, issued Jan 19, 2023 (Docket No. 359531) pp 8-10 (finding that a conservator was able to grant a Lady Bird deed without court approval because it did not fundamentally change the protected party's interest). The court in that case read the statutory language to give broad powers

receive court authorization for beginning the process to sell real property, only for authorizing a specific sale.

In the present case, the guardian analyzed Deehan's financial situation and determined it was in his best interest to pursue a sale of the property. After discussion with plaintiffs, the guardian received an offer she was happy with, which she brought to the probate court for its approval. Under MCL 700.5422-5423, the guardian was authorized to pursue a sale of the Property when she received the purchase offer and filed the petition, and did not need to sign the purchase agreement again after getting probate court approval. I believe the trial court erred when it found the guardian was not so authorized.

## B. WAS A BINDING CONTRACT FORMED?

In Michigan, there are five elements necessary for a valid contract: "(1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Innovation Ventures, LLC v Liquid Mfg, LLC*, 499 Mich 491, 508; 885 NW2d 861 (2016) (citation omitted). Then, under Michigan's statute of frauds, for a contract for the sale of land to be valid, there must be a written memorandum of the contract signed by the party with whom the sale is to be made. MCL 566.108.

In her trial brief, defendant has challenged the adequacy of consideration and claimed the contract was not signed by the guardian, violating the statute of frauds. Defendant's trial brief argued that insufficient consideration was paid to consider this a valid contract because testimony at trial confirmed that there was no down payment for the property. While a down payment may be used as consideration, it is not the only acceptable form of consideration. A promise to pay the purchase price has been found to be sufficient consideration. See *Zurcher v Herveat*, 238 Mich App 267, 294-295; 605 NW2d 329 (1999). Both the purchase price and a promise to buy the Property were clearly set forth in the petition as well as the purchase agreement, so the consideration requirement has been met. Furthermore, inadequacy of consideration will only result in annulling the contract if it is "so gross as to shock the conscience of the court," which is not the case here. *Hake v Youngs*, 254 Mich 545, 550; 236 NW 858 (1931). Therefore, defendant's argument that there was insufficient consideration is without merit. Thus, the only remaining issue before the Court regarding contract formation is whether the statute of frauds was satisfied.

The circuit court found that the guardian's petition to the probate court did not satisfy the memorandum requirement of the statute of frauds because it saw the petition as a requisite step to obtain permission to sell, not as a binding document containing a signature memorializing a contract. According to the circuit court, because the guardian was not authorized to enter into a contract until after the probate court granted its permission, any pre-permission signature is not binding; however, had the guardian signed the agreement after the probate court's approval, it would have been binding. As previously discussed, I find the guardian was authorized to pursue a sale pending court approval, so now the question becomes whether the petition serves as a memorandum of the sale such that the statute of frauds is satisfied. While the majority answers

---

to the conservator to act on behalf of the protected party which were only limited by a requirement that when property was sold or disposed, there needed to be court approval.

that question in the negative, I believe the statute of frauds was satisfied under the unique facts of this case.

A memorandum must contain certain "material provisions," that "are the identification of [1] the property, [2] the parties, and [3] the consideration." *Zurcher v Herveat*, 238 Mich App at 290-291. The memorandum can be made up of multiple writings not made as memos. See *Benedek v Mech Prod*, 314 Mich 494, 502-503; 22 NW2d 901 (1946). There is no doubt that the petition which includes the purchase agreement properly described the property, as it included the legal description of the land. There is also no doubt as to the contracting parties, as the petition states "I intend to sell . . . to [plaintiff] Cody Ross" and is signed by the guardian. The petition also includes the purchase price, the promise of which serves as consideration in this case. Therefore, all the necessary provisions of the contract are present, so there is a valid memorandum reflecting the contract. Furthermore, the memorandum is signed by the guardian, the party it is sought to be enforced against; therefore, both requirements of the statute of frauds are satisfied, meaning there is an enforceable contract between the parties.

Accordingly, there exists a contract for the sale of the Property to plaintiffs. While there can be no presumption that a conservator can sell property before there is court approval, once the approval has been given, there is a presumption that the sale will continue according to the probate court's ruling, and a binding contract exists between the parties. The trial court therefore erred when it found no contract between the parties.

### C. PROPER REMEDY

"The remedy for breach of contract is to place the nonbreaching party in as good a position as if the contract had been fully performed." *Corl v Huron Castings, Inc*, 450 Mich 620, 625; 544 NW2d 278 (1996). The standard remedy for a breach of contract is damages; however, where enforcement of a promise is necessary to avoid injustice, specific performance is an alternate remedy.[12] In Michigan, "[l]and is presumed to have a unique and peculiar value, and contracts involving the sale of land are generally subject to specific performance." *Philips v Homer (In re Smith Trust)*, 480 Mich 19, 26; 745 NW2d 754 (2008). Land presumptively has a unique and peculiar value which would make damages an inadequate remedy, so when plaintiffs entered into a contract for the sale of the Property, damages would be insufficient to put them in as good a position as if the contract had never been breached. Therefore, the contract for the sale of the Property is subject to specific enforcement. There is no need for them to put on an extra showing of why the equitable remedy is necessary because it is presumed necessary based on the fact that land is the subject matter of the contract. See *id.*; see also *Kent v Bell*, 374 Mich 646, 651; 132 NW2d 601 (1965) (finding that because the plaintiff had stated a cause of action relating to land that the claim was subject to specific performance). Furthermore, the contract between the parties has a clause entitling plaintiffs to specific performance on the contract in the event of a default by the seller, which has happened in this case.

---

[12] See *Giordano v Markovitz*, 209 Mich App 676, 680; 531 NW2d 815 (1995); see also *Thermatool Corp v Borzym*, 227 Mich App 366, 376; 575 NW2d 334 (1998); *Parkhurst Homes, Inc v McLaughlin*, 187 Mich App 357, 360-361; 466 NW2d 404 (1991).

III.  CONCLUSION

For the reasons stated above, I conclude the guardian was authorized to sell the Property, and accepted plaintiffs' conditional offer to purchase the Property contingent on the probate court's approval.  When that approval was given, a binding contract to sell the Property to plaintiffs was formed.  Defendant has no authority to deny the sale of the Property based on title as the equitable title passed to plaintiffs and defendant retains only bare legal title as collateral.

Accordingly, I would reverse and remand for an order to be entered on plaintiffs' claim for specific enforcement of the land sale contract according to the agreement approved by the probate court.

/s/ Kathleen A. Feeney